**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **LARS ST. JOHN,** ) | **CASE NO. 1:10-cv-954** |
| ) | |
| **Plaintiff,** ) | |
| ) | **MAGISTRATE JUDGE GREG WHITE** |
| v. ) | |
| ) | |
| **BOSLEY, INC., et al.,** ) | |
| ) | |
| **Defendants.** ) | **MEMORANDUM OPINION & ORDER** |

On November 12, 2010, Plaintiff, Lars St. John ("St. John"), *pro se*, filed an Amended

Complaint stating claims against numerous Bosley, Inc. ("Bosley") employees.[1,2] Specifically,

the Amended Complaint alleged that Defendants Bosley, MHR, Dr. Gabriel Krenitsky, Randall

Miller, Maureen Lenon, Linda Coyne, Matt Leavitt, and James Doucette (collectively referred to

---

[1]On April 28, 2010, St. John filed a Complaint raising claims of sexual harassment and race discrimination in violation of Title VII and § 1981 as well as state law claims of bodily injury and breach of contract. (Doc. No. 1.) On August 6, 2010, this Court dismissed St. John's sexual harassment and gender discrimination claims under Title VII (including dismissal of defendant Michael Leavitt.) (Doc. No. 5.) The Court ruled that St. John may proceed on a federal § 1981 claim, as well as state bodily injury/medical malpractice and breach of contract claims. *Id.* On November 12, 2010, with leave of Court, St. John filed his Amended Complaint. (Doc. No. 13.) On April 21, 2011, the Court denied St. John's request to reinstate the sexual harassment claim. (Doc. No. 60.)

[2]The procedures at issue in this case were performed at Medical Hair Restoration ("MHR") which subsequently merged with Bosley, Inc. The Court added Bosley as a defendant after taking judicial notice that in August, 2010, Bosley, Inc. and MHR filed a Certificate of Merger issued by the Secretary of the State of Delaware. (Doc. No. 13.) The Court hereinafter refers to the corporate defendant as "Bosley."

as "Defendants") (1) committed "bodily injury" against St. John during hair graft surgeries; (2) breached their contracts with St. John; and, (3) discriminated against St. John based on race pursuant to 42 U.S.C. § 1981. St. John requests punitive and compensatory damages. The parties consented to the jurisdiction of this Court pursuant to the authority of 28 U.S.C. § 636(c)(2). Presently before the Court is Defendants' fully briefed motion for summary judgment. (Doc. Nos. 63, 71, 72.)

## II. Facts

St. John contacted Bosley in the summer of 2007, inquiring about its hair restoration procedure. (St. John Dep., Doc. No. 67-1 at 50-51.) In December 2007, Maureen Lenon scheduled St. John for an initial consultation on January 14, 2008, with Dr. Krenitsky. *Id.* at 55-56; Krenitsky Aff. at ¶ 2. St. John spoke with Lenon during the initial consultation and expressed interest in the follicular unit extraction procedure ("FUE"). (St. John Dep. at 60-64.) The conversation included how the FUE procedure was performed and the costs involved. *Id.* at 61. Lenon indicated that Dr. Krenitsky had experience performing the FUE procedure. *Id.* at 62.

St. John also met with Dr. Krenitsky who asked St. John about his past doctors, the procedures they performed, and the number of hair grafts he had received. *Id.* at 64. St. John believed these questions to be inappropriate and refused to answer. *Id.* at 65.

Dr. Krenitsky advised St. John that FUE grafts are more difficult, but still possible, to perform on African-American patients because of the nature of their hair. (Krenitsky Aff. at 2.) Dr. Krenitsky offered to perform a test graft surgery on St. John to assess whether he would be a good candidate for the procedure. *Id.* at 2; St. John Dep. at 68-69. The test, scheduled for January 29, 2008, went well, and, as a result, St. John entered into a contract with Bosley and Dr.

2

Krenitsky to perform a more extensive FUE procedure consisting of approximately two hundred and fifty grafts. *Id.*, St. John Dep. at 79-80.

The first procedure was scheduled for March 28, 2008. *Id.* at 3; St. John Dep. at 92-93. Dr. Krenitsky placed two hundred fifty grafts around the back of St. John's head.[3] *Id.* at 2-3; St. John Dep. at 92; 3/28/08 Operative Report. St. John acknowledged that the FUE procedure was routine and without any complications. *Id.* at 3, St. John Dep. at 97.

At the same appointment, St. John also underwent a revision procedure on a scar that another doctor had performed z-plasty surgery on four times. *Id.* at 3; St. John Dep. at 93. St. John does not believe that Dr. Krenitsky charged him for the scar revision. (St. John Dep. at 93.) St. John was dissatisfied because Dr. Krenitsky told him he could remove up to eighty-five percent of the scar, but he believed Dr. Krenitsky only removed fifty percent. *Id.* at 96. St. John felt the scar revision surgery "was horrible" and that Dr. Krenitsky "did a really bad job." *Id.*

St. John claimed that the March 28, 2008 surgery resulted in bleeding and/or scabbing. (St. John Dep. at 101-102.) He did not follow-up immediately about his concerns with Bosley because he believed that he could wait until his scheduled post-operative visit. *Id.* at 102-103.

On April 7, 2008, St. John returned for a post-operative visit. *Id.* at 104; Krenitsky Aff. at 4. He was seen by a medical assistant. (St. John Dep. at 105.) St. John's medical records indicate that besides a "slight wound dehiscence at the area of the scar revision, he was doing well." (Krenitsky Aff. at 4.) St. John reported that the medical assistant told him that there was a hole in his head that had never been sutured. (St. John Dep. at 104-105.) St. John was given

---

[3]St. John testified during his deposition that he believes he received only 20-50 grafts, rather than the 250 agreed upon. *Id*. at 148.

an ointment and told to leave the scab alone to heal. *Id.* at 106-107.

Several days later,[4] St. John saw Dr. Krenitsky who took pictures and advised St. John to put ointment on the area at issue. *Id.* at 113-114. St. John testified that he thought it would heal better if left dry. *Id.* at 113.

St. John entered into a second contract with Bosley for Dr. Krenitsky to place 113 hair grafts in the scar area. *Id.* at 136. This surgery took place on March 30, 2009. *Id.* St. John testified that during the procedure, he heard a "scraping" sound and felt pressure. *Id.* at 138. However, Dr. Krenitsky told him that this was normal. *Id.* at 138-139. Bosley scheduled a follow-up appointment for St. John on April 28, 2009. *Id.* at 142. Instead of returning to Bosley, St. John testified that on April 28, 2009, he visited Lakewood Hospital emergency room where a nurse practitioner told him that the wound should have healed in the first week. *Id.* at 140, 146, 154; Doc. No. 71-4 at 4-7.

On April 21, 2009, St. John sent a letter to MHR's Chief Executive Officer, Randall Miller, informing him of his unfavorable experiences with Bosley employees and Dr. Krenitsky. (Doc. No. 71-3.) St. John also filed a complaint with the medical board. (Doc. No. 71-4 at 2-3.)

St. John represents that he currently has nerve damage and experiences tingling or twitching in the surgical area. *Id.* at 157-158.

### III. Standard of Review

Federal Rule of Civil Procedure 56(a) governs summary judgment motions and states:

> The court shall grant summary judgment if the movant shows that there is no
> genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[4]The parties dispute whether it was April 11, 2008, or April 14, 2008. (St. John Dep. at 108.)

matter of law.

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989)(*citing Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*. "[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Liberty Lobby*, 477 U.S. at 257.

In other words, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S.

372, 380, 127 S.Ct. 1769, 1776 (2007). Thus, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*.

It is well-settled that "inartfully pleaded allegations in a *pro se* complaint are held to less stringent standards than formal pleadings drafted by lawyers." *Franklin v. Rose*, 765 F.2d 82, 84-85 (6th Cir. 1985) (internal quotation marks omitted) (*citing Haines v. Kerner*, 404 U.S. 519, 520 (1972)). Further, allegations in *pro se* pleadings are entitled to "liberal construction" which sometimes requires "active interpretation ... to encompass any allegation stating federal relief." *Id*.

### IV. Law and Analysis

#### A. Bodily Injury Claim Under Ohio Revised Code ("O.R.C.") § 2305.10

St. John alleges that Dr. Krenitsky caused bodily injury on two separate occasions. The first occurred on March 28, 2008, when the doctor allegedly left an unsutured "hole" in his head following FUE and scar revision surgery.[5] The second was on March 30, 2009, when St. John alleges Dr. Krenitsky intentionally carved a hole in his head while performing an FUE in scar tissue.

St. John relies on O.R.C. § 2305.10(A) which provides that an action for bodily injury shall be brought within two years after the cause of action accrues. Defendants contend that since this claim is specifically directed toward Dr. Krenitsky regarding medical treatment, St.

---

[5]Defendants claim that St. John abandoned this claim as he did not mention it in his opposition brief. (Doc. No. 72 at 2, fn. 3.) However, since St. John is proceeding *pro se*, the Court liberally construes his pleadings and will address both instances of alleged bodily injury.

John is actually raising a medical malpractice claim, which in Ohio has a one-year statute of limitations (O.R.C. § 2305.113). (Doc. No. 72 at 2.) Defendants argue the medical malpractice claim was filed beyond the one-year time period and, therefore, is time-barred. *Id*.

O.R.C. § 2305.113(A) provides that a medical malpractice claim shall be commenced within one year after the cause of action accrues. The statute then proceeds to define a medical claim as:

> any claim that is asserted in any civil action against a physician, podiatrist, hospital, home, or residential facility, against any employee or agent of a physician, podiatrist, hospital, home or residential facility, or against a licensed practice nurse, registered nurse, advanced practice nurse, physical therapist, physician assistant, emergency medical technician-basic, emergency medical technician-intermediate, or emergency medical technician-paramedic, and that arises out of the medical diagnosis, care, or treatment of any person.

O.R.C. § 2305.113(E)(3). The Supreme Court of Ohio, however, determined that "for purposes of the [O.R.C.] 2305.113(A) one-year statute of limitations, a medical claim under [O.R.C.] 2305.113(E)(3) is a claim that both (1) arises out of the medical diagnosis, care or treatment of any person and (2) is asserted against one or more of the statutorily enumerated medical providers." *Estate of Stevic v. Bio-Medical Application of Ohio, Inc*., 121 Ohio St.3d 488, 491, 2009-Ohio-1525, 905 N.E.2d 635 (2009).

St. John argues that O.R.C. § 2305.10 is applicable. The Ohio Supreme Court has explained that "the two-year statute of limitations contained in [O.R.C.] 2305.10 governs claims of bodily injury resulting from the alleged negligence of health-care professionals other than those expressly included in [O.R.C.] 2305.11." *Evans v. Hanger Prosthetics & Orthotics, Inc*., 735 F.Supp.2d 785, 790 -792 (N.D. Ohio 2010) (*quoting Investors REIT One v. Jacobs*, 46 Ohio St.3d 176, 180, 546 N.E.2d 206 (1989)). *See also Whitt v. Columbus Coop.*, 64 Ohio St.2d 355,

7

415 N.E.2d 985 (1980); *Richardson v. Doe*, 176 Ohio St. 370, 199 N.E.2d 878 (1964). In *Evans*, the Court applied a two-year statute of limitations to plaintiffs alleged injury against a health care professional (prosthetists).

As St. John's claims of bodily injury are brought against Dr. Krenitsky, a physician, based on medical procedures he performed, they fall under O.R.C. § 2305.113; and, therefore, the one-year statute of limitation is applicable.

Pursuant to Ohio law, the limitations period begins to run upon the latter of: (1) the date of negligence; (2) the termination of the physician-patient relationship for that condition; or (3) when the patient discovers or, in the exercise of reasonable care and due diligence, should have discovered, the resulting injury. *Frysinger v. Leech*, 32 Ohio St.3d 38, 512 N.E.2d 337 (1987). Here, St. John's claim regarding the procedure performed on March 28, 2008, is time-barred. By his own admissions, he knew about the unsutured hole by his follow-up appointment on April 7, 2008. (St. John Dep. at 105.) As early as April 21, 2009, St. John sent a letter complaining of his treatment during the March 30, 2009, procedure to MHR's Chief Executive Officer, Randall Miller. Certainly, St. John was aware of his second claim prior to sending the letter. Moreover, Dr. Krenitsky did not treat St. John after March 30, 2009, and no one at Bosley had any contact with him after April 23, 2009. (Krenitsky Aff., ¶ 16; Coyne Aff., ¶ 6.) Filed on April 28, 2010, beyond the one-year limitations period, St. John's Complaint is time-barred.

Alternatively, the Defendants argue that, other than speculative or inadmissible statements, St. John has submitted no evidence, including expert evidence, to support his allegations. (Doc. No. 72 at 3-6.) St. John contends that Defendants have submitted false, fictitious and fraudulent statements and "cherry picked" other statements in order to mislead the

8

Court. (Doc. No. 71 at 1.)

St. John relies on his own statements that are either contradictory to earlier testimony, or speculative. For example, St. John stated in his opposition brief: "Also out of his peripheral vision the plaintiff was able to see the movement of Dr. Krenitsky. The plaintiff believes Dr. Krenitsky's movement was not consistent with someone making pin-size incision." (Doc. No. 71 at 5.) It is well-established, however, that a party cannot submit an affidavit that contradicts earlier testimony to avoid summary judgment." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). At his earlier deposition, St. John was asked: "I assume you weren't able to see exactly what [Dr. Krenitsky] was doing right?" and St. John responded: "No, I just felt it." (St. John Dep. at 140.) The Court must disregard the statements in St. John's brief as they contradict his earlier deposition testimony.

St. John also relies on a statement from a medical assistant that Dr. Krenitsky made a mistake in not suturing a hole during the March 28, 2008, procedure. (Doc. No. 71 at 7.) Defendants maintain that this claim is meritless for two reasons: (1) it is inadmissible hearsay as St. John did not provide an affidavit from the medical assistant (Doc. No. 72 at 5), and (2) St. John abandoned this argument by not raising it in his opposition brief. (Doc. No. 72 at 5 fn. 6.)

In a medical malpractice case, Ohio courts typically require medical expert testimony in order to establish whether a physician acted outside the requisite standard of care. *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 130-132, 346 N.E.2d 673 (1976). Here, St. John provides no expert medical testimony or report. By motion filed on June 8, 2011, St. John requested the Court to appoint a medical expert. (Doc. No. 69.) The Court denied the request as there is no authority

9

allowing the Court to expend public funds for appointment of an expert witness.[6] (Doc. No. 70.) The statute of limitations notwithstanding, St. John has presented no evidence to support his medical malpractice claim, rendering it meritless.

### B. Breach of Contract Claim - O.R.C. § 2305.06

St. John raises a breach of contract claim contending that Bosley must honor the "pre-revised contract" that "guaranteed results." (Doc. No. 15 at 5.) St. John contends that under the agreement he was to receive 250 hair grafts during the March 30, 2009, procedure. *Id.* St. John maintains that at trial follow-up photographs, as well as a live visual, will show that he did not receive 250 hair grafts. (Doc. No. 71 at 8.) He also alleges that Bosley's Customer Service Supervisor, James Doucette, promised him that Bosley would replace the 250 grafts, but later reneged. *Id.*

St. John relies on a MHR advertisement which states:

> MHR Guarantee
> MHR assures all patients that each grafted hair will grow in, provided the patient follows the pre and post-operative instructions, or we will replace those grafts at absolutely no charge. If we are unable to replace the grafts, we may choose to refund the fee.

(Doc. No. 71-7.)

Under Ohio law, to establish a breach of contract claim, a plaintiff must first prove the existence of a binding contract or agreement. *Garofalo v. Chicago Title Ins. Co.*, 104 Ohio App.3d 95, 108, 661 N.E.2d 218 (Ohio App. 8th Dist. 1995). A plaintiff must prove all of the essential elements of a contract, including an offer, acceptance, manifestation of mutual assent,

---

[6] On June 21, 2011, St. John filed a motion for reconsideration of the Court's denial of the request to appoint a medical expert, which the Court struck from the record due to the impertinent, scurrilous, and irrelevant matters St. John raised in the motion. (Doc. No. 74, 78.)

consideration, and certainty as to essential terms. *Kostelnik v. Helper*, 96 Ohio St.3d 1, 3, 770 N.E.2d 58 (2002). After establishing the existence of a binding contract, a plaintiff must next establish that he performed his contractual obligations, and that the defendants' breach damaged him. *Garofalo*, 104 Ohio App.3d at 108.

Defendants do not dispute that contracts were entered into for the FUE surgery performed on March 28, 2008, and March 30, 2009. (Doc. No. 63 at 15.) They do, however, dispute that the contracts were breached. *Id*. Dr. Krenitsky testified, and the medical records prepared at the time of surgery, demonstrate that St. John received the agreed upon 250 grafts. (Krenitsky Affid. at ¶ 13, Doc. No. 63-4.) Additionally, Dr. Krenitsky testified that during the March 2009 procedure, he observed evidence of appropriate hair growth from the 250 grafts done in March 2008. (Krenitsky Affid. at ¶ 13.) As to the March 30, 2009, procedure, under the contract, St. John was to receive 113 grafts. (Doc. No. 63-5.) The record indicates he received 117 grafts. *Id.* St. John's argument that he did not receive all of the hair grafts as set forth in the contracts is supported only by his own speculation.[7] (Doc. Nos. 71-5, 73, 76-2.) St. John submitted photographs allegedly taken at the time of the procedures in support of his claim, which were incorporated into the record. (Doc. No. 76.) The photographs, however, are not helpful. Furthermore, St. John has offered no argument as to how the photographs support his claim. As the record reflects that St. John received the agreed upon number of hair grafts at both surgeries, the Court finds St. John's breach of contract claim to be meritless.

**C. Discrimination Claim - 42 U.S.C. § 1981**

---

[7]The Court also notes that St. John, who was wearing a hat during his deposition, refused to remove it after opposing counsel requested him to do so. (Doc. No. 63-1 at 2.)

11

St. John alleges that the Defendants discriminated against him based on race in violation of 42 U.S.C. § 1981.[8] (Doc. No. 15 at 6-8.) § 1981 prohibits intentional racial discrimination in the making and enforcing of contracts with both public and private actors. This extends to "the making, performing, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

To establish a viable discrimination claim and avoid summary judgment, a plaintiff must provide the Court with either direct evidence of discrimination or meet the burden shifting standard of proof for Title VII cases established in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989) (superseded on other grounds); *Hardman v. Univ. of Akron*, 40 Fed. Appx 116, 119 (6th Cir. 2002). Direct evidence is evidence which if believed, proves the existence of a fact in issue without inference or presumption. *Arimi v. Case Western Reserve Univ.*, 5 F.Supp.2d 563, 566 n.3 (6th Cir. 1998). If there is no direct evidence, plaintiff may also provide circumstantial evidence to create an inference of discrimination. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). "Mere personal belief, conjecture and speculation are insufficient to support an inference of . . . discrimination." *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997).

As St. John has not presented any direct evidence of discrimination, the Court will apply the *McDonnell-Douglas* burden-shifting analysis as modified for § 1981 commercial establishment claims by *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862 (6th Cir. 2001). To state a prima facie case of discrimination under 42 U.S.C. § 1981, the plaintiff must show

---

[8]The Court's Order dated August 6, 2010, rejected St. John's Title VII claims, but allowed him to proceed on the alleged § 1981 violation. (Doc. No. 5 at 3-4.)

12

that: (1) he belonged to a protected class; (2) he sought to make a contract for services ordinarily provided by the defendants; and (3) he was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship while similarly situated persons outside the protected class were not, or he was treated in such a hostile manner that a reasonable person would find it objectively discriminatory. *Keck v. Graham Hotel Systems, Inc.*, 566 F.3d 634, 639 (6th Cir. 2009); *Christian*, 252 F.3d 872.

The Supreme Court has ruled that § 1981 provides relief only "when racial discrimination blocks the creation of a contractual relationship [or] impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476, 126 S.Ct. 1246, 163 L.Ed.2d 1069 (2006). The Court emphasized that a plaintiff can state a claim under § 1981 only when he is able to identify injuries flowing from a "racially motivated breach of [his] own contractual relationship ...." *Id*. at 480.

In *Keck*, the Sixth Circuit held that a hotel could be liable under § 1981 for refusing to lease its banquet facilities for a wedding to an African–American couple. *Keck*, 566 F.3d at 636. The hotel, presumably, had no obligation to lease its facilities to any particular customer, but the absence of such an obligation did not permit the hotel to violate § 1981. In *Christian*, a Wal–Mart store had no obligation to sell toys to any particular customer. *Christian*, 252 F.3d at 872. That did not preclude § 1981 liability when a Wal–Mart employee falsely accused an African–American shopper of stealing from the toy section and had her ejected from the store. *Christian*, 252 F.3d at 864.

In the instant matter, there is no dispute that St. John meets the first two prongs, *i.e.*, as he

13

is a member of a protected class and he entered into contracts with Bosley for FUE hair grafts. St. John, however, has not established that he was deprived of services while similarly-situated persons outside the protected class were not. Nor has he established that he was treated in a hostile manner.

St. John claims he did not receive a follow-up phone call after surgery. (Doc. No. 15 at 6.) Defendants, however, presented evidence that attempts were made to contact St. John after his surgeries. He had provided Bosley with his home number which did not have voicemail capabilities. When Defendants' attempts to call St. John went unanswered, they could not leave a message.[9] (Doc. No. 63 at 18-19; Coyne Affid. at ¶ 3; St. John Dep. at p. 75; Krenitsky Affid. at ¶ 14.)

In addition, St. John contends that he received no meal after his surgeries. He maintains that he witnessed white patients receiving meals following surgery. (Doc. No. 15 at 7.) Defendants aver that meals are provided to patients after lengthy procedures – those lasting over four hours. (Krenitsky Aff. at ¶ 15.) As St. John's longest procedure lasted approximately 2-1/2 hours (St. John Dep. at 77), he was not provided a post-operative meal. Furthermore, St. John did not provide evidence that similarly-situated white patients received a post-operative meal. The Court finds that St. John has not submitted any evidence that he was treated unfairly or differently than patients outside of the protected class.

Defendants further argue that St. John has not demonstrated that he received services in a

---

[9]There is an immaterial factual dispute as to whether St. John owned a cell phone during the relevant time period. Defendants maintain that St. John refused to give his cell number, while St. John testified that he did not have a cell phone during this time period. (Doc. No. 71-9.)

"markedly hostile manner" that a reasonable person would find objectively discriminatory. (Doc. No. 63 at 20.) In determining whether Defendants' actions rise to the level of being markedly hostile pursuant to § 1981, courts consider whether the conduct is "(1) so profoundly contrary to the manifest financial interests of the merchant and/or her employees; (2) so far outside of widely-accepted business norms; and (3) so arbitrary on its face, that the conduct supports a rational inference of discrimination." *Keck*, 566 F.3d at 641.

Specifically, St. John maintains that because Coyne refused to give messages to defendant Maureen Lenon, he had to make a trip to Bosley in order to schedule a third surgery date. *Id*. Further, at one appointment he had been waiting thirty minutes and it was not until a Caucasian patient arrived that Coyne told Lenon that both patients were waiting. *Id*. He alleges that even though the appointment would have taken only three minutes, Lenon told him that she needed to see her next appointment, and that she would mail the contract to him. (Doc. No. 15 at 8.) Other than St. John's statements, he presents no evidence of any hostility. Defendant Coyne's affidavit establishes that her conduct was not hostile towards St. John. The Court cannot conclude that the alleged conduct is so far outside of business norms or that it is so arbitrary on its face that a rational inference of discrimination exists.

Even if St. John could establish a *prima facie* case of race discrimination, his claim is meritless. The burden would then shift to Defendants to "articulate some legitimate, non-discriminatory reason" for its actions. *Christian*, 252 F..3d at 868. In the instant matter, the Defendants have done so. Defendants provided affidavit testimony showing that Coyne attempted to contact St. John, both to check on his post-operative status and remind him about upcoming appointments. Defendants also provided testimony demonstrating that meals were

15

only provided to patients following procedures over four hours.

After defendants produce evidence of its non-discriminatory reason for its actions, any presumption of discrimination falls away and the production burden shifts back to the plaintiff. *Christian*, 252 F.3d at 879. Hence, St. John would have the burden to show that Defendants' proffered reason is not the true reason, but is a pretext for discrimination. *Id*. In order to avoid summary judgment on his discrimination claims, St. John must present evidence that creates a genuine issue that the reasons given by Defendants are pretextual, *i.e.*, a "cover-up" for its illegal motive to discriminate. *McDonnell-Douglas Corp*., 411 U.S. at 802.

A plaintiff can demonstrate that defendants' proffered reasons are pretextual in one of three ways: (1) the stated reasons have no basis in fact – that they never happened; (2) the stated reasons were not the actual reason – that an illegal motivation is more likely; and (3) that the stated reasons are insufficient to explain the defendants' actions. *Christian*, 252 F.3d at 879. St. John has presented no evidence that the Defendants' articulated reasons were pretextual.

The Court concludes that St. John has not met his evidentiary burden to establish a *prima facie* case that Defendants intentionally discriminated against him.

### V. Conclusion

For the above reasons, the Court grants Defendants' Motion for Summary Judgment. (Doc. No. 63.)

IT IS SO ORDERED.

                                              s/ Greg White
                                             United States Magistrate Judge

Date: September 8, 2011